Filed 3/27/15  P. v. Nazario CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ANDREW NAZARIO,<br><br>　　Defendant and Appellant. | G049424<br><br>(Super. Ct. No. 13WF1136)<br><br>O P I N I O N |

　　　　　　　Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

　　　　　　　Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　　　　Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

　　　　　　　　　　　*　　　　　*　　　　　*

A jury convicted defendant, Andrew Nazario,[1] of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and misdemeanor false representation to a police officer (Pen. Code, § 148.9, subd. (a)). The court sentenced her to three years in state prison.

Defendant argues the court violated her right to confrontation by not allowing her to cross-examine the victim about a prior misdemeanor conviction for soliciting prostitution and that her counsel was ineffective, both as to this issue and because he failed to request a jury instruction for brandishing a weapon.

We disagree and affirm.

## FACTS AND PROCEDURAL HISTORY

One evening in April 2013 Samuel Garcia was driving through Stanton. Although he was aware prostitutes used that area, he denied knowing transvestite prostitutes frequented it or that he was looking for a prostitute. As he drove he saw a prostitute, who was later identified as defendant, waving at him. Even though defendant looked female, Garcia later suspected she might be a man.

After Garcia arranged to have intercourse with defendant for $80, defendant got into Garcia's car and they drove to a motel where defendant had a room. When Garcia got to the room it was messy and dark, causing him to feel uneasy. He wanted to go into the restroom so he could investigate defendant's gender. When he opened the door he saw a man sitting on the toilet. Garcia left the room without engaging in any sexual activities.

Defendant followed him, asking him to stay, but Garcia declined. When she caught up with Garcia, she "pok[ed]" him on his back but Garcia kept walking. Defendant kept poking Garcia's back and then reached for his back pocket where he kept

---

[1] Although defendant is a biological male she identifies as a female and we use feminine pronouns when referring to her.

2

his wallet. Garcia put his hand over his pocket. When his pocket ripped, he turned to push defendant away.

Defendant punched Garcia in the chest, twice. The second time the pain was "very sharp." He did not see anything in defendant's hand but when he kicked her and she fell down, something that sounded metallic dropped. Defendant ran to his car and drove away. He noticed he was bleeding and went to the hospital. He had a stab wound requiring 18 stitches that left him with a three-and-a-half-inch scar. He did not call 911 because he did not want the police involved. Someone at the hospital called the police.

Deputy Dennis Gabrielli interviewed Garcia in the hospital. In explaining the incident, Garcia did not mention defendant was a man.

Investigator Mike Starnes also interviewed Garcia. Garcia did not tell Starnes defendant was a male until Starnes asked that specific question. Garcia denied he had discussed having sex with defendant or a price.

Garcia told Starnes he saw defendant holding a two-to-three-inch long "T-bone" knife, describing it as the type a person can "put between [her] knuckles." When he saw the knife he tried to get out of the way. Defendant punched him in the face. Garcia never told Starnes defendant had pushed or poked at him as he descended the stairs.

Starnes also interviewed defendant. When Garcia stopped for defendant she did not reveal she was a man because it was clear based on her features. Garcia agreed to pay her $80 and they returned to defendant's motel room, where they had anal intercourse. She had not asked for payment beforehand and Garcia left without paying. Defendant ran after Garcia to get the money owed to her, grabbing on to his pants pocket where she saw his wallet. Defendant told Starnes she had taken her knife from her belt and "held it to [Garcia] in a threatening manner," demanding payment. Garcia was injured. She said she did not know how the knife had opened.

3

A few days after the incident another deputy searched defendant's motel room. Defendant identified herself with a different name and birth date. She did so because she was afraid.

Defendant testified she considers herself to be, and for three years had been living exclusively as, a female. She had been a prostitute for one year, working in a "known" transvestite prostitution area. She had only male clients and none had ever been surprised she was a biological male.

She and Garcia drove to her motel together. He told her to go to her room and followed her a couple of minutes later. No one else was in the room. The bathroom door was open. They had anal sex and she went into the bathroom. Although she normally asked for payment in advance, she had not done so because she was desperate for money.

When she came out of the bathroom, Garcia was leaving. He did not answer when she asked for payment. She did not push or poke Garcia but ran after him, grabbing on to his pocket to slow him. He yanked away, causing her to stumble and lose her balance.

Defendant normally carried a three-inch "flip-blade" knife on her belt. It had a retractable blade that came out when a button on the side of the handle was pushed. When she stumbled, she picked up her knife that had fallen to the ground. Garcia turned around, grasping her by the arms. Still holding the knife, she pushed Garcia away and he let go. She then saw his shirt was cut and noticed for the first time the knife blade extended.

She did not pull out the knife or in any way stab at or punch Garcia. She did not intend to cut him. The stabbing was an accident. She acknowledged she had told Starnes she had pulled out the knife to scare Garcia but admitted that was not true. Starnes had suggested that she had done so and she agreed so she would not get into trouble.

4

When Garcia left, defendant went to her room. She cut her hair and dressed as a man. When she was stopped by the police a few days later, she gave a false name out of fear of being arrested.

Additional facts are set out in the discussion.

## DISCUSSION

*1. Exclusion of Garcia's Prior Conviction for Soliciting Prostitution*

*a. Defendant's Request to Admit Conviction and Court's Denial*

In 2009 Garcia was convicted of misdemeanor solicitation of prostitution as the "john." (Pen. Code, § 647, subd. (b).) Before trial defendant's lawyer sought to have that conviction admitted into evidence to impeach Garcia. The parties agreed Garcia's prior felony conviction for counterfeiting checks (Pen. Code, § 470, subd. (d)) was admissible based on moral turpitude. But as to the solicitation conviction, the court stated, "Those are misdemeanors. I am not thinking that those would be [admissible]." Both counsel agreed.

Later, the prosecutor asked the court to revisit the question, stating that the solicitation charge might not be admissible as to a crime of moral turpitude but it could be relevant as to Garcia's explanation about what happened. Defense counsel believed it could be used to impeach Garcia, depending on his testimony. He agreed to make an offer of proof at that time.

After Garcia testified, defendant's lawyer argued Garcia had "portrayed himself as being this naive person that naively entered a dark[]room" and took certain actions. Garcia had presented an inaccurate picture of himself. Further, when asked why he did not call the police, Garcia explained he was not worried about prostitution. That was misleading and defendant should be able to cross-examine him about his prior arrest. The real reason he did not want the police called was so he would not get arrested again.

The court excluded the prior conviction. It did not agree Garcia had depicted himself as naïve, just very casual about soliciting a prostitute. Likewise,

5

Garcia's failure to call the police did not show he was naïve. The court did not believe the jury had a false impression of Garcia. Nor did it believe the conviction was relevant and even if it was "in a technical legal sense relevant," Evidence Code section 352 barred admission. The court stated it had "to be very careful about just cavalierly letting in someone's prior conviction for a misdemeanor."

### b. Defendant's Sixth Amendment Right of Confrontation

Defendant argues the court's exclusion of Garcia's solicitation conviction violated his Sixth Amendment right to confront and cross-examine Garcia. We disagree.

The confrontation clause only "'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) Therefore, the trial court has broad discretion "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Ibid.*)

While a defendant has the right to cross-examine about a prior conviction (*Davis v. Alaska* (1974) 415 U.S. 308, 316), he does not have the right to do so with every conviction. As defendant acknowledges, the court has the discretion under Evidence Code section 352 to exclude use of even felony convictions of crimes of moral turpitude. (*People v. Clair* (1992) 2 Cal.4th 629, 654.) The court's ruling here certainly did not exceed the "'bounds of reason.'" (*Id*. at p. 655.)

Defendant was afforded the opportunity to cross-examine Garcia extensively and vigorously did so. This included questions about his contradictory statements to investigators, his failure to explain to the police defendant was a male, and his statement defendant punched him in the face as opposed to the chest. Defense counsel also focused on Garcia's statements he had not discussed having sex or the price. Further, although Garcia told Starnes he had seen the knife, at trial he admitted he had not

6

seen it.  Finally, defense counsel cross-examined Garcia about his felony counterfeit check conviction.

In support of her argument the misdemeanor solicitation conviction should have been admitted defendant relies on several facts.  She highlights Garcia's inconsistent testimony, especially what she asserts is Garcia's claimed naiveté about defendant's gender.  She further highlights contradictions between his testimony and statements to police about the scuffle with defendant and whether or not he saw the knife.

Defendant also relies on the fact the jury acquitted her of attempted second degree robbery and a great bodily injury enhancement.  She points to the jury's questions about the definitions of willfully and directly, both relating to the assault with a deadly weapon jury instruction.  Defendant concludes the jury had reasonable doubts about that charge, claiming that had the solicitation conviction been admitted, it would have called into question Garcia's testimony defendant stabbed him.  Defendant also asserts that testimony would have been undermined by the solicitation conviction because it would have shown Garcia "was more sophisticated that he pretended to be."

These arguments are unavailing.  The very fact of Garcia's contradictory testimony casts doubt on his credibility.  Further, Garcia's felony conviction for check counterfeiting, which was admitted, is much stronger evidence going to his credibility than the misdemeanor solicitation conviction.  Moreover, there is little connection between the solicitation conviction and Garcia's explanation about the stabbing, thus supporting the court's exclusion on the basis of Evidence Code section 352.  We see no abuse of discretion.

### c. Misdemeanor Conviction and Moral Turpitude

Defendant asserts the court believed it did not have the authority to admit the prior conviction because it was not a crime of moral turpitude or because it was a misdemeanor or both.  Thus, he continues, the court did not abuse its discretion; it did not exercise its discretion at all, thereby committing a legal error because soliciting

7

prostitution is a crime of moral turpitude, and a misdemeanor conviction of a crime of moral turpitude is admissible.[2] Although the court initially seemed to rely on one or both of these grounds, neither was the basis of the actual ruling.

Rather, exercising its discretion, the court found the conviction was not relevant and even if it were it was barred by Evidence Code section 352. It did not agree Garcia had presented a false picture of himself, i.e., that he was naïve about prostitution. And it specifically ruled the court had to be careful about "cavalierly" admitting a misdemeanor conviction, thereby implying it understood misdemeanors could be used for impeachment. Thus, there was no error.

2. *Ineffective Assistance of Counsel*

*a. Introduction*

To prevail on an ineffective assistance of counsel claim, a defendant must show that, viewed objectively, counsel's performance fell below prevailing professional standards and was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) To prove prejudice, defendant must demonstrate there is a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "'''A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" [Citations.]' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) "'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.]" (*People v. Cox* (1991) 53 Cal.3d 618, 656, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945 ["'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed'"].)

_____

[2] The Attorney General disputes these claims but we need not decide this issue.

8

### b. *Prior Conviction For Solicitation*

Defendant argues his trial counsel was ineffective because he did not know and did not tell the court the soliciting conviction was a crime of moral turpitude. Without deciding the adequacy of counsel's performance, the alleged error did not result in a miscarriage of justice such that it is reasonably probable there would have been a more favorable outcome for defendant but for the alleged error. The court did not exclude the evidence because it was not a crime of moral turpitude. Rather, it found the conviction was not relevant and even if there was some relevance, it was outweighed by prejudice. (Evid. Code, § 352.) Thus, it was inconsequential that counsel did not inform the court he believed the soliciting conviction was a crime of moral turpitude.

### c. *Jury Instruction for Lesser Related Offense of Brandishing*

Defendant also argues counsel was ineffective because he did not request a jury instruction on brandishing a knife, a lesser related offense of assault with a deadly weapon. We are not persuaded.

A defendant is guilty of misdemeanor brandishing when, "except in self-defense, in the presence of any other person, [he] draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel." (Pen. Code, § 417.)

Defendant asserts that in closing argument her lawyer argued she had committed brandishing and not assault, when he stated, "Assault with a deadly weapon requires an act with a knife that, by its nature, would directly and probably result in the application of force. And this is an important issue, because what – you know, we're talking about what happens with the knife. Holding a knife out, just holding a knife, what we sometimes call brandishing, is not an assault. You stab, you slash, you do some action with the knife, that becomes an assault. Just simply holding the knife is not an assault."

9

Shortly thereafter counsel argued, "So what do we have for reasonable doubt? At worst, he displayed a knife. He didn't swing it. He didn't stab. He didn't slash. And you heard nothing from Mr. Garcia that says otherwise."

But in between those statements, counsel stated, "Again, [defendant] is not guilty of [assault with a deadly weapon] . . . if he acted without the intent. So if that cut happened by accident, and he didn't intentionally swing it, poke it, slash it at Mr. Garcia, then he is not guilty of [assault with a deadly weapon]."

And after the second portion of the argument on which defendant relies, her lawyer stated, "It doesn't make sense that he is now going to pull out a knife and start slashing him up. [¶] He didn't open up the blade portion before the struggle. The knife opened up accidentally during the struggle. And that's what really makes sense in this scenario. [¶] And he accidentally cut him when he attempted to separate himself." The argument emphasized and focused on the accidental nature of the stabbing.

Likewise, in discussions about jury instructions, defendant's attorney sought an accident instruction (CALCRIM No. 3404). In arguing for its inclusion, he cited to defendant's testimony that she was not displaying or slashing with the knife. "[Defendant] is not swinging it or doing it in a manner that would constitute an assault, and there's a struggle over the knife and [Garcia] is accidentally cut." So "[i]f the jury has found him guilty of attempted robbery . . . they could find accident as to the [great bodily injury] and not find him guilty of [great bodily injury]. [¶] And I think as far as the assault with a deadly weapon goes, I think there's at least enough evidence for the jury to render a decision of whether he is simply displaying the knife or doing something that would constitute assault . . . . The jury is going to have to argue whether or not that's an assault or that, again, is accident."

Based on defendant's testimony, closing argument, and discussions about jury instructions we can think of at least one good reason why counsel did not request a brandishing instruction: it was not consistent with his theory of the case, that defendant

10

accidentally stabbed Garcia.  A brandishing instruction is based on the premise that she did the opposite.

"'[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.'  [Citation.]"  (*People v. Weaver*, *supra*, 26 Cal.4th at pp. 925-926.)

Because we have no record of trial counsel's reasons for not requesting the instruction, and because there is a reasonable explanation of why counsel did not, we reject the ineffective assistance of counsel claim.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.

11